IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CAYLIN THOMAS BROWN, | |
| Plaintiff, | **4:13CV3042** |
| vs. | |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration; | **MEMORANDUM AND ORDER ON REVIEW OF THE FINAL DECISIONO F THE COMMISSIONER OF SOCIAL SECURITY** |
| Defendant. | |

Caylin Thomas Brown filed a complaint on February 28, 2013, against Michael J. Astrue, who was then serving as Commissioner of the Social Security Administration.[1] (ECF No. 1.) Brown seeks a review of the Commissioner's decision to deny his application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq. The defendant has responded to the plaintiff's complaint by filing an answer and a transcript of the administrative record. (See ECF Nos. 11, 12). In addition, pursuant to my order of June 3, 2013, (ECF No. 14), each of the parties has submitted briefs in support of his or her position. (See generally Pl.'s Br., ECF No. 15; Def.'s Br., ECF No. 20). After carefully reviewing these materials, I find that the Commissioner's decision must be affirmed.

## I.   BACKGROUND

Brown initially applied for disability benefits on September 29, 2010, alleging an onset date of January 28, 2010. (See ECF No. 12, Transcript of Social

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin was substituted as a party on March 1, 2013, after she was appointed to serve as Acting Commissioner of the Social Security Administration.

Security Proceedings (hereinafter "Tr.") at 157). After his application was denied initially and on reconsideration, (id. at 58-61, 70-73) Brown requested a hearing before an administrative law judge (hereinafter "ALJ").   (Id. at 7, 79-80). This hearing was conducted on April 30, 2012. (Id. at 24-46.) In a decision dated May 3, 2012, the ALJ concluded that Brown was not entitled to disability insurance benefits. (Id. at 8-23). The Appeals Council of the Social Security Administration denied Brown's request for review. (Id. at 1-6.) Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Brown seeks judicial review.

## II.   SUMMARY OF THE RECORD

Brown, whose date of birth is January 15, 1988, testified that he injured his back in January 2010 when he was lifting a headboard. (Id. at 29-30). He herniated several discs in his back. (Id. at 30). About six months later, he had a lumbar laminectomy. He had a second surgery in August 2010 after he fell and re-herniated the discs. (Id. at 30-31). Brown had not been employed full-time since the initial injury. (Id. at 30).

### A. Medical Evidence

After Brown injured his back in January 2010, he began treatment for recurrent back pain with David Lindley, M.D. (Id. at 275). On February 2, 2010, Lindley noted that Brown showed tenderness in the paralumbar muscles on the left side and reported pain shooting down his left leg. Lindley stated that Brown "[a]lmost certainly" suffered from discogenic issues, but "[h]e really can't afford further investigation." Lindley stated that he talked to Brown about weight loss because he weighed 408 pounds at that time. (Id.).

Brown returned to Lindley on March 8, 2010, reporting "horrible right leg

2

pain again." (Id.). Lindley reported that the pain was recurrent with markedly reduced straight leg raising on the right side, pain shooting down the back of the leg, and tenderness in the paralumbar muscle in the right side. Lindley noted that prednisone had worked the previous time, but Brown was "[b]etween a rock and a hard place without any insurance." Lindley prescribed prednisone, Percocet, ibuprofen, and Flexeril. Lindley asked Brown to consider having an MRI and again addressed the need for Brown to lose weight. (Id.).

Brown continued to see Lindley for treatment. On April 4, 2010, Lindley noted that Brown had markedly reduced straight leg raising and some tingling down his leg. Lindley stated that Brown clearly had sciatica secondary to disc entrapment. Lindley stated that Brown was struggling to take any action about his weight, had not been able to go to work, and had not been out of the house for two weeks. Lindley reported that he completed paperwork to obtain Medicaid since Brown needed an MRI of his lumbar spine as he had failed to obtain relief with anti-inflammatories and pain medications. Because prednisone had helped some, Lindley refilled Brown's prescriptions for it and Percocet. (Id. at 275-76).

Lindley saw Brown in April and May 2010 and continued to prescribe Percocet. (Id. at 276). On May 18, 2010, Brown had an MRI. (Id. at 279, 356). The report on the MRI indicated that Brown had large disc herniations at L3-L4 and L4-L5 causing severe central stenosis impinging the intrathecal nerve roots, large central L5-S1 disc herniation without anatomic impingement, and mild left paracentral T12-L1 subligamentous disc herniation abutting the anterior conus. (Id. at 279). He was diagnosed with L3-4 and L4-5 herniated disc, lumbar radiculitis, lumbar spondylosis, and lumbar degenerative disc disease. (Id. at 282).

Omar Jimenez, M.D., performed a lumbar discectomy at L3-4 and L4-5 on June 25, 2010. (Id. at 282). Brown reported that he did well initially after surgery,

but six days later, he fell and had worsening pain in his right lower extremity. (Id. at 328). On July 6, 2010, Brown returned to Jimenez. Brown also reported that he had spent five hours sitting at the races four days earlier and that his symptoms progressed after that. He reported pain shooting down his right leg, but it was more like a muscle ache than the intense pain he had before surgery. He did not have any numbness. (Id.). Jimenez ordered a lumbar x-ray, which showed no fracture of the spine. (Id. at 349). The notes indicate that the examination was limited due to Brown's "body habitus." (Id.). An MRI (Id. at 280, 353) indicated postsurgical changes at L3-L4, including persistent large disc extrusions, which caused moderate canal stenosis at L3-L4 but had mass effect along nerve roots at that level. There was severe canal stenosis at L4-L5 with complete obliteration of the CSF space. (Id. at 280). There was subligamentous disc extrusion at T12-L1 which deformed the anterior aspect of the conus. (Id. at 281, 354). After another MRI on July 27, 2010, showed recurrent disc herniations at L3-4 and L4-5, Jimenez recommended re-exploration and a discectomy at those levels. Jimenez told Brown that the injury could recur, and if it did, he might need a fusion of the spine. (Id. at 327). The second discectomy of L3-4 and L4-5 was completed on July 28, 2010. (Id. at 299-300, 309). After the second surgery, Brown continued to have leg pain posterior to his ankles. A CT lumbar spine showed no abnormalities. (Id. at 300, 315). Before he left the hospital, he was being seen by physical therapy, but his progress was slow. (Id. at 300).

By August 20, 2010, Lindley reported that Brown was doing very well and that his back pain had improved significantly. (Id. at 326). Brown stated that he had mild discomfort when he bent forward and slight pain in the right hip. He had normal sensation to light touch in both legs. Lindley recommended Brown begin physical therapy twice a week for four weeks and renewed the prescription for

4

Percocet. (Id.). By September 8, 2010, Brown reported some persistent back pain but less pain in his legs. (Id. at 276). Lindley prescribed Norco in order to wean Brown off of Percocet. (Id.).

Brown continued to see Lindley periodically, reporting continued back pain. On April 18, 2011, Brown stated that he was having "horrible back pain" and that his legs at times became numb and caused him to "drop to the floor." (Id. at 386). Lindley stated that he talked to Brown about weight loss. Lindley was not sure of any other treatment for Brown, who did not have medical insurance, and Lindley was reluctant to continue prescribing pain medications. Lindley referred Brown to Jimenez. (Id.).

On June 7, 2011, Jimenez reported that Brown said he had never completely been 100 percent better after surgery, but he had improved about 70 or 80 percent. (Id. at 387). However, his back pain had returned. The new lumbar MRI showed there was a slight recurrence of a herniated disc at L3-4, L4-5, but it was not as large as it had been previously. Jimenez recommended physical therapy, but Brown stated he did not have funds to pay for it. Jimenez also talked to Brown about the possibility of injections, but again he was worried about having no insurance. Brown had full strength in both lower extremities. Jimenez stated that if Brown was not progressing by June 17, 2011, he would try to get Brown some interventional treatments including injections. (Id.). The record does not show any additional treatment by Jimenez.

Brown saw Lindley on July 22, 2011, (Id. at 386) and November 22, 2011, for a recheck of his back pain. Brown reported that the pain was persistent and constant. (Id. at 383). Pain medications were prescribed. (Id. at 385-86).

## B. Medical Opinion Evidence

Jerry Reed, M.D., completed a physical residual functional capacity (RFC)

assessment of Brown on November 19, 2010. (Id. at 367-74). Reed determined that Brown could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. (Id. at 368). He could stand and/or walk and sit for about six hours in an eight-hour workday. Brown was unlimited in his ability to push and/or pull. (Id. at 368). He could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Id. at 369). Reed noted that Brown reported mild discomfort when he bent forward, but he had normal sensation to light touch in both legs and his reflexes were normal. (Id.). Brown had no manipulative, visual, or communicative limitations. (Id. at 370-71). It was recommended that Brown avoid concentrated exposure to extreme cold, vibrations, or hazards. (Id. at 371).

Reed noted that although physical therapy had been recommended, there was no evidence that Brown had followed through with it. (Id. at 374). Brown admitted to decreased pain and improved symptoms after surgery, but his report of activities of daily living reflected a different story with quite exaggerated symptoms compared to the most recent medical records. Reed stated that Brown seemed to be quite active when visiting friends and family on a daily basis. He reported using a motorized cart for shopping, but there was no mention of decreased mobility and it was unclear if he used the cart for convenience. (Id.). Reed reported that a third party indicated that Brown had no problem with independence and was able to keep his house clean and to care for his pets. Reed stated that Brown was considered to be partially credible due to inconsistencies in his activities of daily living. Brown continued to seek pain medications, but the medical records showed improvement in his symptoms following two surgeries. It was likely that he would continue with pain medications while he fully healed from the surgery. Overall evidence indicated that Brown was capable of working as outlined in the RFC. (Id.).

Glen Knosp, M.D., affirmed Reed's RFC. (Id. at 377). Knosp noted that Brown's statements to his medical providers contradicted his disability allegations. He had reported he was doing well with significant improvement in his pain level, to the point it was almost gone, and he had no discernable weakness. He had been released from care, but had failed to start physical therapy as directed. (Id. at 378). Brown's morbid obesity was a chronic condition, but Brown was able to move about independently and care for his own personal needs. (Id.).

## C. Hearing Testimony

At a hearing on April 30, 2012, (Id. at 26) Brown testified that he did not complete high school because he did not have enough credits by the time he was 21 years old, so he voluntarily withdrew and later obtained a GED. (Id. at 28-29). From the time he was 15 until he was 19 he worked as a carpet installer. He had also previously worked as a dishwasher, at a sandwich shop, and as a driver for the railroad. (Id. at 29).

Brown testified that in January 2010 he herniated a few discs in his back when he was lifting a headboard. (Id. at 29-30). He had not been employed full-time since that date. (Id. at 30). After the first lumbar laminectomy, Brown said his hips and back hurt all the time. In August 2010, he fell and re-herniated the discs and had a second surgery. (Id. at 30-31). Since that time, Brown said he can sit or stand for about 15 minutes because he has to change positions constantly. (Id. at 31). Brown said he was able to lay (sic) down for about five or six hours. (Id. at 32). After he lays (sic) down, Brown said he is stiff and has "pretty bad" pain. He stands and walks around a little to stretch out, then lays (sic) back down for a little bit before he can sit and stand for the rest of the day. He rated his pain as eight out of ten for the first two hours of the day. After he takes medication, it drops to about a five or six for the rest of the day. By the end of the day, the pain is back to an

7

eight. (Id.).

Brown said after his second surgery he tried to exercise by stretching and walking longer distances for two or three months, but none of it helped and actually made it worse. (Id. at 39-40). When he tried to walk around three blocks, he had to stop because of the pain and called for a ride to pick him up. (Id. at 39). Brown said he is 6'2" tall and weighs between 350 and 375. (Id. at 35). His father provides his living quarters and pays Brown's bills. (Id.). Brown said he has problems dressing because he cannot bend over to pull up his pants and he has difficulty tying his shoes. (Id. at 36). He goes grocery shopping about once each month and is able to push the cart while leaning on it. (Id. at 37). Brown said each day he drives to his father's house, which is about eight blocks away. (Id. at 36-37). He said that in the last year, he had driven 60 miles in the last year "to Illinois." (Id. at 37-38). He lives alone and does not cook much, but fixes sandwiches. He showers because he cannot get out of the bathtub. His father, brother, or a friend help in cleaning the house because he has difficulty bending over. (Id. at 38). Brown said he washes the dishes and cleans the stovetop. His father takes out the trash and mows the lawn. (Id. at 40). Brown spends his time reading, drawing, and painting, and spends 45 minutes having lunch and dinner with his grandmother at his father's house. (Id. at 40-41). He takes his laundry to his father's house, where his father takes it out of the truck and completes it. (Id. at 38).

Brown said he goes to bed at about 11 p.m. and wakes up five times each night, getting up to move around at least twice. (Id. at 33). Brown said he does not take medication to sleep, but he takes hydrocodone every six hours and tramadol every six hours, both for pain relief. (Id. at 33). Brown said his surgeon had talked about fusing the discs in another surgery, but he cannot afford the surgery. (Id. at

34). Brown said the pain affects his concentration and he is easily distracted. (Id. at 34). Brown said he does not use a cane or walker and was not receiving any other ongoing treatment for his back. (Id. at 39). Brown said he did not receive any formal physical therapy because he could not afford it. (Id. at 40).

The ALJ asked Janice Hastert, a vocational expert (VE), (Id. at 41) if a claimant of the same age, education, and work history background, and who is limited to work at the light exertional level, who can occasionally climb, balance, stoop, kneel, crouch and crawl, and who should avoid concentrated exposure to extreme cold, vibrations, and hazardous conditions, could perform any of Brown's past work. (Id. at 42-43). The VE said the only past work Brown could do is cashier. (Id. at 43). However, there is a wide variety of unskilled light occupations that fall within the category of work Brown could perform. Examples were a bench assembler, garment sorter, and inspector/hand packager, all of which had positions in Nebraska and nationally. If the employee was limited to jobs in which he would be able to alternate sitting and standing about every 30 minutes, the bench assembler would remain on the list. (Id. at 43). Other jobs include shipping/receiving weigher and office helper. (Id. at 43-44). If the person was limited to jobs in which he alternated positions from sitting to standing about every 15 minutes, the VE said all gainful work activity would be precluded. (Id. at 44).

### E. The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be disabled at step three or step five. See id. In this case, the ALJ found that Brown is not disabled. (See Tr. at 11-23).

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled.  <u>See</u> <u>id</u>.  The ALJ found that Brown had not engaged in substantial gainful activity from the application date of September 29, 2010. (Tr. at 13).

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."  See 20 C.F.R. § 404.1520(a)(4)(ii), (c); <u>id</u>. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(ii), (c).  The ALJ found that Brown had the following severe impairments: degenerative disc disease of the lumbar spine, status post two surgical operations, and obesity, citing 20 C.F.R. § 416.920(c). The ALJ found no mental impairment. (Tr. at 13).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  <u>See</u> 20 C.F.R. § 404.1520(a)(4)(iii), (d); <u>see also</u> 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment

"that meets or equals one of [the] listings," the analysis ends and the claimant is found to be disabled.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. § 404.1520(a).  The ALJ found that Brown did not have an impairment or combination of impairments that met or medically equaled the severity of  one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). (Tr. at 13).

Step four requires the ALJ to consider the claimant's RFC to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work."  See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f).  In this case, the ALJ wrote:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) in that he is able to lift and carry twenty pounds occasionally and ten pounds frequently. The claimant can walk or stand for six hours in an eight-hour day and sit for six hours in an eight-hour day. However, the claimant must be able to change positions between sitting and standing every thirty minutes. The claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl. Furthermore, the claimant should avoid concentrated exposure to cold temperature extremes. The claimant must also avoid concentrated exposure to vibrations and hazardous conditions.

(Tr. at 14).

The ALJ found that Brown had no past relevant work, had at least a high school education, and was able to communicate in English. The ALJ considered Brown's age, education, work experience, and RFC, and determined that there are jobs that exist in significant numbers in the national economy that Brown can perform. (Id. at 17). He was found to be not disabled. (Id. at 18).

### III.  STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)).  See also Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011).  "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion."  Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on

legal error." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." Id. (citations omitted). No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003). See also Collins, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

Brown asserts generally that the Secretary's final decision is not consistent with the law and that the findings of fact are not supported by substantial evidence on the record as a whole. (Pl.'s Brf at 3). I will address his specific arguments below.

*Number of Jobs*

Brown takes issue with the ALJ's decision related to the number of jobs available for him. The ALJ stated that Brown's ability to perform all or substantially all of the requirements of the level of light work had been impeded by additional limitations. The ALJ asked the VE s hypothetical question as to whether jobs exist in the national economy for an individual with Brown's age, education, work experience, and RFC. The VE testified that given all of these factors, the individual would be able to perform the requirements of representative occupations such as: bench assembler, a light, unskilled occupation with 500 jobs in Nebraska and 100,000 jobs in the national economy; shipping/receiving weigher, a light, unskilled occupation with 150 jobs in the State of Nebraska and 31,500 jobs in the national economy; and office helper, a light, unskilled occupation with 200 jobs in Nebraska and 41,000 jobs in the national economy. (Id. at 18).

13

In his brief, Brown argues that the number of jobs identified by the ALJ is not a reasonable number of jobs in a state with a civilian labor force of 1,005,455 and employment of 960,830. Pursuant to 42 U.S.C. § 423(d)(2)(A), an

> individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

The statute further defines "work which exists in the national economy" as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. The Commissioner may satisfy the burden to show that sufficient employment is available by using the services of a vocational expert. 20 C.F.R. § 416.966(e).

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012), quoting Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011). A vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments. Smith v. Halter, 307 F .3d 377 (6th Cir. 2001).

14

The United States Court of Appeals for the Eighth Circuit has stated that "[t]o decide whether jobs exist in significant numbers, we consider, inter alia, the reliability of the claimant's and the vocational expert's testimony. Ultimately, however, we leave this determination to the trial judge's common sense in weighing the statutory language" (id. at 188) and applying it to the facts of a particular claimant. Long v. Chater, 108 F.3d 185 (8th Cir. 1997). The ALJ should also consider the level of the claimant's disability and the types and availability of work that the claimant could perform. Hall v. Chater, 109 F.3d 1255 (8th Cir. 1997).  In Long, supra, the appellate court agreed with the ALJ's finding that 650 jobs in the state and 30,000 jobs nationwide was a significant number. In Jenkins v. Bowen, 861 F.2d 1083 (8th Cir. 1988), the court found that 500 jobs was a significant number of available jobs, taking into consideration the claimant's work experience and the vocational expert's opinion. In Hall, supra, the appellate court found that as few as 340 jobs constituted a significant number available to the claimant.

In the present case, the VE identified a total of 850 jobs that would be available in Nebraska for Brown. The ALJ determined that the testimony of the VE supported a conclusion that Brown was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (18). Brown admits that "[w]hat constitutes a significant number of jobs is not a mere mathematical computation." (Pl.'s Brf at 6). I find no error in the ALJ's determination that there are a significant number of jobs available to Brown.

## Daily Activities

Brown next argues that the ALJ erred in equating his daily activities with the ability to work. The ALJ determined that Brown's activities were inconsistent with his allegations of disabling pain. (Id. at 16).

On a daily activities and symptoms report completed on October 7, 2010, which was about two months after his second surgery, Brown stated that he fixes microwave meals and can sit in a chair by the stove to cook quick meals. He sits down to load the dishwasher, but he cannot bend over to pick up items, so his father helps with other chores and laundry. He can drive for 10 or 15 miles before he needs to get out and stretch. (Id. at 213). Brown indicated that he draws about four hours per week and reads for three or four hours per day. He lies on his bed because he has extreme pain when he looks down while sitting or standing. (Id. at 214). He said he goes grocery shopping once every two or three weeks. He uses an electric scooter to get around the store and needs help loading and unloading groceries. He said he watches television for one or two hours at a time. Brown stated that he visits friends and family about one or two hours per day or as long as he can handle the pain from sitting. He said he sleeps six or seven hours per night, but tosses and turns every 30 minutes to one hour. Brown said he can walk about one block in 10 minutes but his right leg drags and he has pain down his back, in his hip and down his legs. He also said he has weakness in his legs and feet. Brown said he cannot go up stairs without a handrail and can only go up four to five steps with a handrail due to the weakness in his legs and hips. He claims he can sit for 15 or 20 minutes and then his back starts to hurt. (Id. at 214).

Brown described his symptoms as a constantly stiff back with a sharp pain across his right hip and down his legs, as well as numbness and weakness in his legs and feet. (Id. at 215). He said changing positions helped for about three to five minutes, but his pain was worse when bending, lifting, sitting, standing, walking, or looking down. Brown said he had two or three good days per week. (Id. at 215). At the time, Brown was taking Vicodin, which he said dulls the symptoms after 30

minutes and lasts for about 2½ hours, but it caused memory problems, difficulty concentrating, and drowsiness. (Id. at 216).

Paul Brown, Brown's father, completed a supplemental form in which he stated that Brown prepared most of his own meals and that he interacted four to five times per week with friends or relatives. (Id. at 219). Paul stated that Brown did his own shopping and that he read news and worked on his computer. (Id.). Paul said Brown did well with employers and listened to criticism and responded well. (Id. at 220). He accepted change and adjusted to what needs to be done and was able to concentrate and maintain attention. (Id. at 220-21). Paul said Brown kept his house clean, fed his dog, and had no problems with independence. (Id. at 221).

In interrogatories completed on April 3, 2012, Brown stated that he tries to walk about 20 minutes five or six days per week. (Id. at 261). He said he can perform personal hygiene, including showering, brushing his teeth, shaving, and combing his hair. Brown also stated that he does most of his own cooking. (Id. at 261). In a typical day, Brown wakes up and takes his medication, reads the news while the medications begin to work, takes a shower, gets dressed, walks the dog for about 15 minutes, and then goes to his grandmother's house for lunch. After about 45 minutes to an hour, Brown returns home and lies down to take his medication, reads or watches television for one hour, goes to his father's house and talks for 90 minutes, drives back home and walks his dog for about 10 minutes, and lies down for a while. He goes to his grandmother's home and cooks dinner for her and his father. When he returns home, he reads or draws until he goes to sleep. (Id. at 261). Brown said he reads about six hours per day, for an hour or two at a time. (Id. at 262).

The ALJ noted that Brown's activities of daily living had progressed since his surgery, based on his responses on the function report. (Id. at 16). And the ALJ noted that at the hearing, Brown testified to even greater healing and increased functioning. Paul Brown's function report included a comment that Brown had "no problem with independence." Thus, the ALJ found inconsistency between Brown's activities and his pain allegations. (Id. at 16).

In arguing that the ALJ erred in equating Brown's daily activities with the ability to work, he cites Hughes v. Astrue, 705 F.3d 276 (7th Cir. 2013), in which the United States Court of Appeals for the Seventh Circuit found that substantial evidence did not support the ALJ's decision to deny social security disability benefits. One of the issues in that case was the ALJ's determination that the claimant was not disabled because she was able to do laundry, take public transportation, and shop for groceries. The court noted that a person has more flexibility in scheduling activities of daily living than he would in a full-time job, can get help from other persons with daily activities, and in daily activities, is not held to a minimum standard of performance, as would be the case with an employer. "'The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.'" Hughes, supra, 705 F.3d at 278, quoting Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012). However, the issue of daily living activities was not the only reason the appellate court in Hughes found error in the ALJ's decision. The ALJ had also found that the claimant stopped medical treatment for four years, disregarded a report from a medical expert appointed by the court, and dismissed the claimant's respiratory problems with the fact that she was a smoker. Id.

The ALJ is to consider all evidence, including that related to subjective complaints; the claimant's prior work record; observations by third parties and

treating and examining physicians relating to the claimant's daily activities; the duration, frequency and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility. Johnson v. Apfel, 240 F.3d 1145 (8th Cir. 2001). The court found that the fact that the claimant was able to carry on a normal life contributed to the finding that his impediments were not disabling. Id.

The denial of disability benefits was affirmed by the Eighth Circuit in a case in which the ALJ discounted the claimant's assertion of disabling pain. McDade v. Astrue, 720 F.3d 994 (8th Cir. 2013). The court found that the ALJ provided good reasons supported by substantial evidence. The ALJ had noted that the claimant was not unduly restricted in his daily activities. He had the ability to perform some cooking, took care of his dogs, used a computer, drove wearing a neck brace, and shopped for groceries with the use of an electric cart. The ALJ had also noted that the claimant did not take any long-term narcotic medication for pain relief, despite his allegations of chronic disabling pain. Id.

The Eighth Circuit has stated, "Our cases admittedly send mixed signals about the significance of a claimant's daily activities in evaluating claims of disabling pain." Clevenger v. Social Security Administration, 567 F.3d 971 (8th Cir. 2009). However, the claimant in that case had reported that she engaged in an array of such activities—including doing laundry, washing dishes, changing sheets, ironing, preparing meals, driving, attending church, and visiting friends and relatives. Id. The court stated that it was not unreasonable for the ALJ to rely on that evidence to infer that the claimant's assertion of disabling pain was not

entirely credible. Id. The appellate court concluded that the ALJ's decision was supported by substantial evidence on the record as a whole. Id.

In this case, the ALJ found that Brown's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Brown's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. at 14). The ALJ explained his reasons for finding that Brown's allegations of pain were not fully credible. Brown asserted that his pain was so severe that it required him to change positions every 15 minutes and to lie down five to six hours a day. (Id. at 15). First, the ALJ noted that the clinical signs and findings on examination after the second surgery had been essentially benign. Second, the ALJ noted that the medical records did not support Brown's testimony that he needed another surgery, but he cannot afford it. During two postoperative visits, Jimenez had not opined that Brown needed further surgery. Instead, Jimenez recommended physical therapy on both occasions, but Brown had not undergone any physical therapy. He continued to take pain medication, which he said reduced his pain. And Brown did not testify to any adverse side effects from medications and the medical records did not contain any reports or complaints of side effects. (Id. at 15-16). The ALJ found that Brown's treatment and efforts to relieve his pain since his surgery were inconsistent with his subjective allegations. (Id. at 16). In addition, there was no evidence to support Brown's allegations of distractibility or difficulty concentrating due to his pain. He had not reported that symptom to any of his physicians and neither doctor noted this symptom in their medical records. The ALJ found no medical support for the alleged disabling pain. (Id.).

20

The ALJ also found that Brown's activities of daily living had progressed since his surgery. Two months after his second surgery, Brown reported that he was able to prepare his own meals and load the dishwasher. He was able to drive short distances, and he shopped for groceries every two to three weeks. Brown reported that he visited friends and family and he engaged in various hobbies such as drawing and reading. (Id.). Brown's testimony at the hearing reflected even greater healing with increased functioning. Paul Brown, Brown's father, reported that Brown took care of his pets, had no problems grooming, and was able to keep his house clean, and that Brown had no problem with independence. The ALJ stated, "Overall, the claimant's activities are inconsistent with his allegations of disabling pain." (Id.).

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Eichelberger v. Barnhart, 390 F.3d 584 (8th Cir. 2004). The ALJ properly made the determination that Brown was only partially credible due to the inconsistencies mentioned above.

The ALJ also noted that Brown had a poor work history, even prior to his injury in January 2010. (Tr. at 16). He had been eligible to work since approximately 2004, but between 2004 and January 2010, Brown had earned a total of $3,087.99. In fact, in the two years prior to his injury, Brown earned a total of $253.75. "The claimant's work history prior to his alleged onset date shows that he may not be highly motivated to work." (Id.). It was reasonable for the ALJ to consider that the poor work history undermined Brown's credibility because "[a] lack of work history may indicate a lack of motivation to work rather than a lack of ability." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).

As the ALJ noted, the inability to work without some pain or discomfort is not necessarily disabling under the Social Security Act. Rather, the issue is "whether the pain is [of] such debilitat[ing] and intractable nature as to preclude all substantial gainful activity." (Tr. at 16). The ALJ found that Brown's pain would not preclude all work activity. (Id.).

The ALJ found that Brown's impairments required a reduction of the RFC. (Id.). Based on the totality of evidence, the ALJ found that Brown would be capable of performing less than the full range of light work. The ALJ gave significant weight to the opinions of the state agency physicians, who have expert training in the rules and regulations pertaining to disability claims, and their opinions were consistent with the examination findings from Lindley and Jimenez. The ALJ noted that there were no contrary opinions from any treating, examining, or reviewing physician that Brown would be more limited than found by the ALJ. (Id. at 17).  Based on the substantial weight of the objective evidence, Browns' course of treatment, his level of daily activity and his work history, the ALJ found that Brown retained the RFC for the range of light work. The RFC was adjusted to give Brown the benefit of the doubt with regard to his allegations of disability. (Id.).

I do not find that the ALJ equated Brown's ability to perform some light household chores with the ability to work full-time. The ALJ considered Brown's daily activities, along with the medical evidence and Brown's testimony. The ALJ found Brown to be partially credible and provided sufficient reasons for his determination.

*Consideration of Obesity*

Finally, Brown asserts that the ALJ did not discuss the "normal limitations concomitant with excess weight" and that the medical consultant did not discuss the impact of obesity on Brown's ability to work. (Pl.'s Brf at 9).

The record shows that obesity was addressed. The ALJ identified obesity as one of Brown's severe impairments. (Tr. at 13). Brown reported his weight as 390 pounds and his height as 6'2" tall. The ALJ stated that this would give Brown a body mass index of approximately 51.4, which is considered in the obese range. The ALJ stated that obesity may result in an individual having limitations in exertional functions, postural functions, the ability to manipulate objects, or to tolerate extreme heat, humidity, or hazards. (Id.). "[T]he combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." (Id. at 13, citing SSR 02-01p). The ALJ stated that the effects of Brown's obesity had been considered in determining his RFC. (Id. at 13). Thus, the record shows that the ALJ took Brown's obesity into consideration, even though Brown did not contend in his disability application or at his administrative hearing that his obesity prevented him from working. (Id. at 201, 26-41).

A finding of obesity does not equate with a finding of disability. Forte v. Barnhart, 377 F.3d 892 (8th Cir. 2004). In that case, the appellate court rejected the claimant's argument that the ALJ erred in failing to consider his obesity in assessing his RFC. "Although his treating doctors noted that [the claimant] was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions." Id., 377 F.3d at 896. In Box v. Shalala, 52 F.3d 168 (8th

Cir. 1995), the appellate court determined that the failure of the Secretary's decision to discuss obesity as an impairment was not fatal.

I find that the ALJ appropriately took into consideration the evidence related to Brown's obesity in adjusting the RFC. This alleged error has no merit.

## V.   CONCLUSION

The ALJ determined that Brown was capable of performing light work. The ALJ based his decision on the entire medical record and adjusted it to give Brown the benefit of the doubt as to his allegations of disability. (Tr. at 17). Therefore, the ALJ found that Brown was not under a disability at any time from September 29, 2010, the date he filed the application for disability. (Id. at 18).

I find that there is substantial evidence based on the entire record to support the ALJ's factual findings.  Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997). I find that the decision must be affirmed.

IT IS ORDERED that the Commissioner of Social Security's decision is affirmed.

DATED March 24, 2014.

BY THE COURT:

Warren K. Urbom
United States Senior District Judge

24